IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| ROSEMARY PERDUE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:11cv1005-WKW |
| | ) | |
| ALABAMA DEPARTMENT OF | ) | |
| PUBLIC SAFETY, | ) | |
| | ) | |
| Defendant. | ) | |

# RECOMMENDATION OF THE MAGISTRATE JUDGE

## I.   INTRODUCTION

Plaintiff Rosemary Perdue ("Perdue" or "Plaintiff") filed her Complaint (Doc. #1) alleging claims under Title VII of the Civil Rights act of 1964 ("Title VII"), the Americans with Disabilities Act ("ADA") and the Rehabilitation Act.  Comp. (Doc. 1).

On December 5, 2011, the District Judge entered an Order (Doc. #5) referring this matter to the undersigned Magistrate Judge "for all pretrial proceedings and entry of any orders or recommendations as may be appropriate."

On January 12, 2012, this court granted Defendant's motion for a more definite statement. *See* Order of January 12, 2012.  On February 15, 2012, Plaintiff filed an Amended Complaint.  *See* Am. Compl. (Doc. 24).  On February 28, 2012, Defendant filed a Motion to Dismiss, or in the Alternative, a Motion for More Definite Statement. (Doc. 25).   On June 6, 2012, the District Judge entered an Order adopting the undersigned's Recommendation that the Motion be Dismiss be granted as to all

1

individual Defendants and denying the request for a more definite statement.  *See* Order of June 4, 2012 (Doc. 29).  On September 14, 2012, Plaintiff filed a Second Amended Complaint.  (Doc. 44).

Before the court is Defendant's Motion for Summary Judgment (Doc. 53) and Brief in Support (Doc. 54).  Plaintiff filed a Response (Doc. 53) and Brief in Support (Doc. 56).  Upon consideration of the Motion for Summary Judgment (Doc. 53), the pleadings of the parties, and the evidentiary materials filed in support thereof, it is the Recommendation of the undersigned Magistrate Judge that the Motion for Summary Judgment be GRANTED.

## II.   STANDARD OF REVIEW

Under Rule 56(a) of the Federal Rules of Civil Procedure, a reviewing court shall grant a motion for "summary judgment if the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).[1]  Only disputes about material facts will preclude the granting of summary judgment.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986).  "An issue of fact is 'genuine' if the record as a whole could lead a reasonable

---

[1] On December 1, 2010, amendments to Rule 56 became effective.  The instant motion was filed on December 3, 2010.  The amendments to Rule 56 generally reorganize the provisions of the Rule and incorporate language which is "intended to improve the procedures for presenting and deciding summary judgment-motions and [is] . . . *not intended to change the summary-judgment standard or burdens.*"  *Farmers Ins. Exchange v. RNK, Inc.*, 632 F.3d 777, 782 n.4 (1st Cir. 2011) (internal quotations omitted) (emphasis in original).  Moreover, because the summary judgment standard remains the same, the amendments "will not affect continuing development of the decisional law construing and applying" the standard now articulated in Rule 56(a).  Fed. R. Civ. P. 56(a) advisory committee's note to 2010 amendments.  Accordingly, while the Court is bound to apply the new version of Rule 56, the undersigned will, where appropriate, continue to cite to decisional law construing and applying prior versions of the Rule.

trier of fact to find for the nonmoving party.  An issue is 'material' if it might affect the outcome of the case under the governing law."  *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir.1996) (quoting *Anderson*, 477 U.S. at 248).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion[,]" and alerting the Court to portions of the record which support the motion.  *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986).  However, once the movant has satisfied this burden, the non-movant is then similarly required to cite to portions of the record which show the existence of a material factual dispute.  *Id.* at 324.  In doing so, and to avoid summary judgment, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The parties must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations[], admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(A) & (B).

If the non-movant "fails to properly address another party's assertion of fact" as required by Rule 56(c), then the Court may "consider the fact undisputed for purposes of the motion" and "grant summary judgment if the motion and supporting materials - including the facts considered undisputed - show that the movant is entitled to it."  Fed. R. Civ. P. 56(e)(2) & (3).

In determining whether a genuine issue for trial exists, the court must view all the evidence in the light most favorable to the nonmovant. *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003). Likewise, the reviewing court must draw all justifiable inferences from the evidence in the non-moving party's favor. *Anderson*, 477 U.S. at 255. After the non-moving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).

## III.   STATEMENT OF UNDISPUTED FACTS

Per the court's Order, the parties met and conferred and developed a set of uncontested facts. The Court has carefully considered that submission, the pleadings in this case, and all documents submitted in support of, and in opposition to, the Motion for Summary Judgment. The submissions of the parties establish the following relevant facts, s*ee* Fed. R. Civ. P. 56(e)(2):

Plaintiff filed the Charge of Discrimination with the EEOC on July 6, 2011. (Doc. 1-1 at 6). Defendant, the Alabama Department of Public Safety (DPS), is one of the State of Alabama's largest law enforcement agencies. Until February 16, 2013, DPS's five divisions—Administrative, Highway Patrol, Alabama Bureau of Investigation, Driver License, and Service Division—were each typically headed by law enforcement officers who obtained the rank of Major.

**Plaintiff's Employment History with Defendant**

Plaintiff began working for Defendant on March 12, 1990, as a Clerk II in the Accident Records Unit of the Driver License Division earning $461 every two weeks. Within one year, she was promoted with a pay raise to Clerk Typist II in the Auto Theft Unit of the Alabama Bureau of Investigation. Within the next year, she was again promoted with a pay raise to Clerk Steno II within the same unit. Plaintiff left employment with Defendant in June of 1994 and worked for other state agencies until April of 1998. Defendant then hired Plaintiff as a Planning and Economic Specialist (PEDS) I/II. That position was under the Administrative Division at all times relevant to this case.

Plaintiff was promoted to PEDS III in 2000 and was promoted to PEDS IV in 2008. Plaintiff held that position until she retired. Plaintiff applied for disability retirement with the Retirement Systems of Alabama on June 27, 2011**.** Plaintiff's application was granted and the retirement became effective on August 1, 2011. Before Plaintiff retired, her salary was approximately $74,000 a year. Her primary responsibility as PEDS IV was to supervise three employees who, along with Plaintiff, sought to obtain and maintain funding for Defendant through grants. Plaintiff was also occasionally tasked with other assignments. Plaintiff was known within the department to be highly skilled at obtaining grants.

Throughout Plaintiff's career with Defendant, she had many personal issues, and those issues were sometimes apparent to her co-workers. Plaintiff cusses like a sailor and has used every cuss word at some point in time while working for Defendant. Plaintiff

openly had sexual discussions with other people in the workplace.  Plaintiff also openly discussed her health issues in the workplace.  Plaintiff was known for sending countless emails throughout the department.  From 2001 to 2005, the supervisor responsible for Plaintiff's performance appraisals was Captain Agatha Windsor, a female.   In Plaintiff's mid-year appraisal for 2001, Captain Windsor wrote that Plaintiff had difficulty working for  more than one supervisor, failed to realistically view her  role within the department, had a tendency to get involved  in the business of other employees and agencies, exhibited  difficult understanding staff-command relationships leading  her to operate outside of her span-of-control, and sought to obtain department funding without discussing it with her  immediate supervisor.  Captain Windsor continued to note on Plaintiff's performance planning forms in 2002 through 2005 that Plaintiff experienced challenges communicating with immediate supervisors leading her to work outside of her span-of-control.

In December 2009, Major Marc McHenry became the Chief of the Administrative Division, which was where Plaintiff worked.  In January 2010, Captain Steve Dixon became the Assistant Chief of the Administrative Division.  That made Plaintiff's chain-of-command from the top down Major McHenry, Captain Dixon, Fran Copeland, and Shaundra Morris.  In February 2011, Renee Stewart Reese became Plaintiff's immediate supervisor, making the chain-of-command Major McHenry, Captain Dixon, Mrs. Copeland, Mrs. Morris, and Mrs. Stewart.

**Facts Surrounding Plaintiff's ADA/Rehabilitation Claims**

When Major McHenry became the Chief of the Administrative Division, Colonel Christopher Murphy was Defendant's Director, and Lieutenant Colonel F.A. "Bubba" Bingham was Defendant's Assistant Director.   When Major McHenry became the Division Chief, the Director and Assistant Director met with him to discuss particular problems within the Administrative Division.  Shortly thereafter, Major McHenry had a meeting with Mrs. Morris, Plaintiff's then immediate supervisor, and instructed Mrs. Morris to have a meeting with Plaintiff about how Plaintiff could become a better employee.  Mrs. Morris then met with Plaintiff on August 25, 2009.  In that meeting, Mrs. Morris advised Plaintiff to  avoid using profanity altogether, to accept responsibility and be willing to answer for resulting consequences, to not  have a sour attitude, and to forward decisions affecting  the division, other divisions, and outside agencies through the chain-of-command.

In October of 2009, Mrs. Copeland, Defendant's Chief Financial Officer, sent Plaintiff an email that requested that any memorandum affecting division chiefs go through the chain-of-command and stated, "The hours of work are 8 am to  5 pm with a few exceptions.  Personnel are expected to be on time.  Progressive discipline will be exercised with those employees who do not adhere to scheduled work hours."  Def.'s Brief (Doc. 54) Ex. B at 46:23-47:15.  Plaintiff replied to that email on the same day with an email stating that she was requesting a reasonable accommodation under ADA because she was diagnosed as bipolar and her medication caused her to sleep late.  In that email Plaintiff noted that, if she went to bed between 8:00 p.m. and 10:00 p.m. on a

regular basis, she had no problems, but that household responsibilities prevented her from going to sleep at those hours.   In her deposition, Plaintiff described those household responsibilities as "chasing dogs that had gotten loose."

Plaintiff was allowed to come in to work at 8:30 a.m., thirty minutes later than the traditional time.   That remained her designated arrival time until she retired.   Plaintiff never requested to have her designated arrival time permanently changed.

To help deal with Attention Deficit Disorder, Plaintiff requested a Blackberry to use for calendaring.   Plaintiff was provided the Blackberry, but she had the data plan turned off because it did not help her.

In November of 2010, Plaintiff requested that Mrs. Morris monitor Plaintiff's mood because Plaintiff had started taking the drug Chantix to quit smoking, which Plaintiff believed to block her prescription drugs Lexapro and Adderral.   Plaintiff quit taking Chantix on December 5, 2010.

On March 31, 2011, Plaintiff requested that she be allowed to park closer to the building due to due to back problems.   Carrying files was the source of Plaintiff's back problem, not walking.   In fact, walking was actually recommended by Plaintiff's doctor. Therefore, Plaintiff was instructed to use a cart to carry items back and forth to her car.

On January 4, 2011, Mrs. Copeland emailed Plaintiff and some other Financial Services Unit employees, stating that nothing was to go directly to the Colonel, including standard transactions, without first going through Captain Dixon or Major McHenry. Major McHenry made it clear that he wanted strict compliance with the chain-of-command from his employees.

8

On January 17, 2011, Plaintiff had a conversation with Kevin Wright, who was a Captain at the time but was to be appointed Lieutenant Colonel and become the Assistant Director of the Department the next day.  He was not within Plaintiff's chain-of-command.  The conversation started with Plaintiff congratulating Kevin Wright on the upcoming appointment before Plaintiff initiated a discussion about grant projects on which she was working.  Plaintiff did not have permission from anyone in her chain-of-command to suggest to Kevin Wright that the two of them should have a meeting.

Two days later, Plaintiff carbon copied Major McHenry on an email to co-workers stating that she had discussed pending projects with "LTC Wright" in the hallway and would be meeting with the new directors in the next couple of weeks to fully brief them. Plaintiff promptly forwarded that same email to Lt.  Col. Kevin Wright.  Major McHenry became upset that Plaintiff was having a conversation and sending an email to the Lieutenant Colonel without receiving permission from her chain-of-command.

That same day at 10:16 a.m., Mrs. Copeland emailed Plaintiff about Plaintiff's contact with the Lieutenant Colonel and reminded her to go through the chain-of-command.  Plaintiff responded to Mrs. Copeland's email at 10:27 a.m..  Then at 10:43 a.m., Plaintiff emailed the Lieutenant Colonel, saying: "Remind me not to talk to you again without permission or immediately telling my Major.  Chewing imminent LOL." *Id*. at Ex. B at 69:6-70:1.  The Lieutenant Colonel wrote back, "Agreed," to which Plaintiff responded, "Change your signature.  606 pending for me. Joy."  *Id*. at Ex. B at 70:2-4.  606 is the number of the Defendant's form used for disciplining an employee.

At approximately 5:15 p.m. on January 26, 2011, Plaintiff had a conversation in the parking lot with Major Herman Wright and Captain Charles Ward, neither of whom were in Plaintiff's chain-of-command, about Plaintiff being frustrated and stressed because of personal issues and job issues, including the workload in her unit, pending budget cuts, and the inability to discuss with her supervisors a memo concerning a speeding ticket Plaintiff had received. Plaintiff admitted that during this conversation that she used "extreme profanity, perhaps at times," including "probably the F-bomb."

Major Wright sent a memo to Major McHenry about the conversation, which stated Plaintiff was upset to the point of being irate and was cussing and ranting about the ticket issue. In relation to Plaintiff's actions in the parking deck and Plaintiff's contact with Kevin Wright, Plaintiff was written up on February 7, 2011, for violation of DPS Rules and Regulations 74(IV)(A), 74(V)(A)(1), and 74(V)(A)(2) and Alabama Administrative Code §§ 670-X-19-.01(1)(a)(7) and 670-X-19-.01(1)(b)(2).

DPS Rules and Regulations 74(IV)(A) defines "conduct unbecoming" and states that it will result in punishment ranging from reprimand to termination of the employee. It states,

> Conduct unbecoming is any conduct that adversely affects the morale, operations, or efficiency of the department; or any conduct which has a tendency to adversely affect, lower, or destroy public respect and/or confidence in the Department of Public Safety or brings discredit upon the officer, employee, or the department as a whole. Conduct unbecoming also includes any conduct which brings the department or members of the department into disrepute.

*Id*. at Ex. A at ¶ 11 & Ex. A2.

10

DPS Rules and Regulations 74(V)(A)(1), and 74(V)(A)(2) state that violations of rules or policies and insubordination are examples of conduct unbecoming. Alabama Administrative Code § 670-X-19-.01(1)(a)(7) makes "[d]isruptive conduct of any sort a violation." Alabama Administrative Code § 670-X-19-.01(1)(b)(2) makes insubordination a violation. As a result of the disciplinary action, Plaintiff was suspended on April 4 and April 5, 2011.

During a January 25, 2011 meeting between Plaintiff's supervisors and Defendant's Personnel Manager Cheri Cook concerning Plaintiff's conduct, issues of Plaintiff's behavior were discussed including her stress, depression, ADHD/ADD, excessive absenteeism and tardiness, erratic working patterns, failure to meet deadlines or work proactively, and use of profanity. Therefore, Plaintiff was referred to the state's Employee Assistance Program (EAP). The EAP is a short-term counseling and referral service designed to help employees become more effective and efficient in their jobs by providing professional, confidential assistance to problems that are likely to affect their family life and/or job performance.

In February of 2011, Mrs. Copeland advised Plaintiff that she should not take off work unless she had to do so because Major McHenry was monitoring Plaintiff's leave. From that point until she retired, Plaintiff was still allowed to take time off for appointments with her doctor, chiropractor, and physical therapist. Plaintiff was given permission by her supervisor to take time off to go to the EEOC. Plaintiff does not recall having been denied sick leave after she filled out the required sick leave request form.

On March 28, 2011, Plaintiff received written counseling for failing to follow her established work schedule by reporting to work at 8:30 a.m.. From September 1, 2010, until March 18, 2011, Plaintiff was absent 36 times and tardy 43 other times out of 137 working days.  Plaintiff prepared a spreadsheet that detailed the reasons why she was absent or tardy.  Among the reasons Plaintiff provided were a wreck on the way into work, talking to "old people" while voting, a truck in need of repair, shopping for clothes during lunch, drinking bad milk, flat tires, checking pipes and tires for major freezes, plumbing issues, a train blocking the tracks, running errands, and a power surge that caused the clocks to be off. Plaintiff admits that some of those reasons were unrelated to any medical disability.  Some of the tardiness was due to Plaintiff working late at night, against the orders of her supervisor, and coming in late the next day.

The original write-up for the absenteeism and tardiness was done on form 606A, a written counseling form, but Major McHenry had Mrs. Morris change the write-up to a 606B, a complaint violation form.  Major McHenry's stated reason for requiring Mrs. Morris to change the write-up from the 606A form to the 606B form is that he wanted a record of the write-up to go in Plaintiff's personnel file, and, unlike the 606B form, the 606A form is not recorded in the employee's personnel file.  The 606B form states that the investigation of the conduct began on March 8, 2011, and Plaintiff initialed it on April 6, 2011.  The rules Plaintiff was accused of violating were DPS  Rules and Regulations 74(V)(A)(16) and Alabama  Administrative Code §§ 670-X-19-.01(1)(a)(2) and 670-X-19.01(1)(a)(3).  All of those rules relate to being absent or tardy. Plaintiff was not suspended or demoted as a result of  the write-up for being absent and tardy.

On February 28, 2011, Plaintiff sent Tara Knee, an attorney at the Alabama State

Personnel Department, an email that stated in full,

> Can you tell life is fun over here right now when you have a Major who is
> ticked off at you?  I may not win, but I won't go down without a fight,
> crossed one too many lines.

*Id*. at Ex. B at 87:12-89:9.

The email was forwarded back to Major McHenry on March 2, 2011.  Plaintiff's

then immediate supervisor, Mrs. Stewart, investigated the email to determine if it

projected a  insolent, sullen, or hostile attitude toward Plaintiff's supervisors in violation

of DPS Rules and Regulations 74(IV)(A) and Alabama Administrative Code § 670-X-19-

.01(2)(b). The DPS Rules and Regulations' definition of insubordination includes

"demonstration of insolent, sullen, or hostile attitude toward supervisors of the

department [. . .]."  *Id*. at Ex. A at ¶ 12 & Ex. A2.  Mrs. Stewart and Mrs. Copeland

recommended that Plaintiff not be punished, while Mrs. Morris recommended 3 days of

suspension and Major McHenry recommended 5 days of suspension.   Ultimately,

Plaintiff was suspended on June 13, 2011 through June 17, 2011 for sending the email to

Mrs. Knee.

### Facts surrounding Plaintiff's Title VII Claim

Plaintiff alleges that in December 2010 one of her female subordinates, Renee G.

Fuller, was denied a promotion by Major McHenry that Plaintiff had requested for Ms.

Fuller.  Plaintiff alleges that Major McHenry told Plaintiff that the pay scale that Plaintiff

sought for Ms. Fuller was designated for someone with supervisory responsibilities and

that Ms. Fuller did not qualify for it because she had no supervisory responsibilities.

Plaintiff alleges that the pay scale that she sought for Ms. Fuller is the same pay scale currently in use by departmental employees at the rank of Sergeant and Lieutenant who are male.  Plaintiff's allegations concerning Ms. Fuller were not included in her EEOC Charge of Discrimination.

Plaintiff alleges that, during a termination proceeding before the Alabama State Personnel Board, Lieutenant Clifford Nall, a DPS employee, complained that his supervisor, Captain Ricky Dale, who was male, cussed in front of him and that the Personnel Board ruled the complaint invalid.  Plaintiff does not know when the incident between Nall and Dale occurred, what the context of the conversation was, how long the conversation lasted, or who were Dale's supervisors.  Plaintiff stated in her deposition that she has no firsthand knowledge of the incident but was told about it from Neil Tew. Neil Tew's sworn affidavit states that he recalls being asked for details about the incident by Plaintiff but that he told her that he knew nothing about it.

### Facts Surrounding Plaintiff's Due Process Claim

Plaintiff's first due process claim revolves around her contention that the email to Ms. Knee about the Major being ticked off at her was an attempt to appeal to the  State Personnel Board for discrimination and that punishment for sending the email interfered with her due  process.

Plaintiff's other due process claims are in relation to her contention that Defendant's internal policies were not precisely followed during investigations of her alleged misconduct and also when she submitted grievances.

**Facts Surrounding Plaintiff's Grant Whistleblower Retaliation Claim**

Plaintiff alleges she was retaliated against in 2002, 2005, and 2006 for being a whistleblower on alleged grant violations by Defendant and its employees.  Below are the quotes from Plaintiff's deposition when she was asked about her actions in trying to stop the alleged violations:

Q     What actions did you take to stop the violations?

A     I kept my documentation. There wasn't anything I could do.  I was a lonely civilian. If I had –

Q     You didn't really take any actions, did you?

A     No. Because if I had, we would have lost every bit of our grant funding. The examiners caught it in 2005, ordered us to pay    back $326,000 for one year.

*Id*. at Ex. B at 155:18-156:5.

**IV.    DISCUSSION**

    *A.    Title VII Claims*

Perdue makes two claims under Title VII: gender discrimination and disparate treatment.  The claims are intertwined.  Under a liberal reading of the Second Amended Complaint, the court can glean that Perdue presents her disparate treatment claim as one based on gender.[2]  Thus, the court will discuss them together.

---

[2]  Without this liberal reading, Perdue has failed to make out any disparate treatment claim, as Title VII prohibits discrimination based on an "individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1)

Many of the instances Perdue points to in support of her Title VII claims in the Second Amended Complaint are titled "Female vs. Female" and offer a comparison of how she was treated compared to other female employees of Defendant. Perdue's claims in those instances cannot survive summary judgment, as she is unable to establish a *prima facie* case of gender discrimination, or disparate treatment based on her gender, because she cannot show that she was "treated less favorably than a similarly-situated individual outside h[er] protected class." *Maynard v. Board of Regents of Div. of Universities of Florida Dept. of Educ. ex rel. University of South Florida*, 342 F.3d 1281, 1289 (11th Cir. 2003). Accordingly, the court will address Perdue's claims of gender discrimination titled "Female vs. Male."

Perdue's first allegation is that Renee G. Fuller was denied a promotion and the promotion was given to a male. As Defendant rightly observes, Perdue lacks standing to bring this claim on Fuller's behalf, because Fuller is not a party to this litigation. and Perdue may not raise claims on her behalf. Indeed, Perdue admits that she did not intend that her allegations regarding Fuller state a distinct claim. *See* Pl.'s Resp. (Doc. 56) at 38.

Perdue's second allegation is that she was suspended for two days for using profanity at Defendant's offices, something she admits was in violation of Defendant's policies. Second Am. Comp. (Doc. 44) at 20. Perdue alleges that a similar complaint regarding a male employee of Defendant using profanity was ruled "invalid" by a reviewing state agency.

16

Because Perdue is attempting to establish a *prima facie* claim of discrimination through circumstantial evidence, the court must utilize the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and its progeny.

> "Under this framework, the plaintiff must establish a prima facie case of discrimination. The establishment of a prima facie case creates a presumption of discrimination. The employer must then offer legitimate, nondiscriminatory reasons for the employment action to rebut the presumption. If the employer successfully rebuts the presumption, the burden shifts back to the plaintiff to discredit the proffered nondiscriminatory reasons by showing that they are pretextual."

*Standard v. A.B.E.L. Serv., Inc.*, 161 F.3d 1318, 1332 (11th Cir. 1998). "To set out a *prima facie* case for disparate treatment in a race or sex discrimination case, the plaintiff may show that: (1) [s]he is a member of a protected class; (2) [s]he was qualified for the position; (3) [s]he suffered an adverse action; and (4) [s]he was treated less favorably than a similarly situated individual outside h[er] protected class." *Maynard*, 342 F.3d at 1289.

Perdue is unable to establish a *prima facie* case. Perdue's claim is that she was told by an "ABI Major" that the Alabama State Personnel Department invalidated a complaint by an employee of Defendant "with regards to his supervisor using profanity in front of him during work hours." Second Am. Compl. (Doc. 44) at 20. First, Perdue's claim is far too vague to serve as a comparator. She merely asserts that someone else told her that this scenario happened and has offered nothing more. There is nothing to suggest the context of the conversation or even what type of profane language was used. Second, as written, her assertions appear to undermine her claim of disparate treatment. In the above scenario involving the male employee, Defendant appears to have treated the male

employee similarly, as a compliant against him was issued.  That another agency later invalidated the complaint does not mean she was treated any different.  Third, in the instance involving Perdue, she was using extreme profane language to her superiors, not the other way around.

In any case, even were Perdue able to establish a *prima facie* case, Defendant has proffered non-discriminatory reasons for the suspension.  That is, Defendant states that the profanity incident involving the male "is a very different circumstance than Plaintiff's conduct which consisted of using extreme profanity to a high-ranking DPS official outside of Plaintiff's chain-of-command concerning Plaintiff's supervisors' actions and which was combined with other incidents of policy violations."  Def.'s Brief (Doc. 54) at 31.  Once Defendant has set forth non-discriminatory reasons for the adverse action, the burden shifts to Perdue to establish that Defendant's proffered reasons were pretextual.  *See Lee v. GTE Florida, Inc.*, 226 F.3d 1249, 1253 (11th Cir. 2000).  Perdue fails to meet her burden. Instead she merely asserts that "[i]f profanity is considered unacceptable, it is considered unacceptable, no matter who it is directed towards."  Pl.'s Resp. (Doc. 56) at 39.  This falls well short of the burden to show that the reasons proffered are merely pretext to survive summary judgment.  Accordingly, Defendant is entitled to summary judgment as to Perdue's Title VII claims.

### B.   *The ADA claims*

Defendant moves for summary judgment as to all of Perdue's ADA claims based on the doctrine of Eleventh Amendment Immunity.  "The 11th Amendment guarantees that nonconsenting states cannot be sued for money damages by private individuals in

federal court.  Although Congress may abrogate the states' immunity in certain situations, it has not done so with regard to suits for monetary damages by private individuals pursuant to Title I of the ADA."  *Ross v. Jefferson County Dept. of Health*, 701 F.3d 655, 658-59 (11th Cir. 2012) (internal citation omitted).  "The Eleventh Amendment protects the immunity of not only the states, but of state agencies and entities that function as an 'arm of the state.'"  *Id.* at 659. (quoting *Manders v. Lee*, 338 F.3d 1304, 1308 (11th Cir. 2003)).  The Alabama Department of Public Safety is a state agency.

Perdue concedes that Defendant "does have immunity under the Eleventh Amendment regarding ADA claims." Pl.'s Brief (Doc. 56) at 33.  Because Eleventh Amendment immunity applies only to claims for monetary damages, the court takes Perdue's concession to mean that she is dropper her request for injunctive relief as to her ADA claims.[3]  Accordingly, the court finds that Defendant's request for summary judgment as to all of Perdue's ADA claims is due to be granted.[4]

### C.    The Rehabilitation Act claims

Plaintiff's claim under the Retaliation Act is that Defendant failed to reasonably accommodate her disability.  Defendant requests summary judgment, arguing that Plaintiff is unable to establish a disability that required the accommodations requested.

---

[3] The injunctive relief requested by Perdue in the Second Amended Complaint in regards to the ADA, was that Defendant establish a valid and enforceable ADA policy that did "not permit a subjective application." Second Am. Compl. (Doc. 44) at 26.  Defendant asserts that it is already under legal obligations regarding its ADA policies and challenges Perdue's standing to seek this relief.  Perdue does not oppose the challenge and admits she lacks standing in her Response.  *See* (Doc. 56) at 40.

[4] The court notes that much of Perdue's Second Amended Complaint involves allegations under the ADA.

The basic framework for analyzing claims under the Rehabilitation Act is as follows:

> The [Rehabilitation] Act prohibits federal agencies [, or recipients of federal money,] from discriminating in employment against otherwise qualified individuals with a disability. *See Sutton v. Lader,* 185 F.3d 1203, 1207 (11th Cir.1999). The elements of a claim under § 501 of the Act are (1) an individual has a disability; (2) the individual is otherwise qualified for the position; and (3) the individual was subjected to unlawful discrimination as the result of his disability. *See id.* The Act defines "individual with a disability" as any person who: "(i) has a physical or mental impairment which substantially limits one or more of such person's major life activities; (ii) has a record of such an impairment; or (iii) is regarded as having such an impairment." 29 U.S.C. § 705(20)(B). In turn, "major life activities" are "functions, such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1614.203(a)(3).

*Mullins v. Crowell,* 228 F.3d 1305, 1313 (11th Cir.2000).

> Under the Rehabilitation Act, a plaintiff can prove disability discrimination through either direct evidence of discrimination, or through circumstantial evidence. If the plaintiff relies on circumstantial evidence, the *McDonnell Douglal* burden-shifting framework applies. Accordingly, the plaintiff must establish a *prima facie* case for discrimination, the defendant must offer a legitimate, non-discriminatory justification for the employment decision, and the plaintiff must ultimately prove that the defendant's justification is a pretext for discrimination.

*Curry v. Secretary, Dept. of Veterans Affairs*, 2013 WL 2161791, *4 (11th Cir. May 21, 2013).

From a liberal reading of the pleadings, the court can conclude that the disabilities which Perdue claims she suffers are Attention Deficit Disorder ("ADD") and depression. For the purpose of this analysis, the court will assume, without finding, that Perdue can establish that she suffers a disability within the meaning of the Act.  The second element

of a Rehabilitation Act claim "requires a court to consider whether a plaintiff is a 'qualified individual,' meaning that she, with or without any reasonable accommodation, can perform the essential functions of the job." *Id.* (citing 42 U.S.C. § 12111(8)). The court is to "conduct a two-step inquiry" asking "whether a plaintiff can perform the essential functions of the job," and, if she cannot, "whether any reasonable accommodation would allow her to do so." *Id.* at *4.

The accommodations requested by Perdue were that (1) a supervisor monitor her mood swings, (2) that she be allowed to arrive at work later than 8:00 am, (3) that she be given a Blackberry cellular telephone, and (4) that she be allowed to park closer to the office building.  The court agrees with Defendant that Perdue's disabilities are not related to these requested accommodations.  Perdue has not established that she could not perform her essential job functions without the requested accommodations and she has not shown that her requests are reasonable accommodations.  "The Rehabilitation Act does not require an employer 'to accommodate an employee in any manner in which that employee desires.'" *Id.* (quoting *Terrell v. USAir,* 132 F.3d 621, 626 (11th Cir.1998)).

### i.   *Mood Swings*

Defendant asserts that this request was not reasonable.  Plaintiff argues in her Response that "had Morris (the supervisor) helped to monitor Plaintiff's moods, Plaintiff might have quit taking Chantrix sooner."  Pl.'s Resp.  (Doc. 56) at 37.  Perdue's request that her supervisor monitor her mood swings and effectively act as her medical doctor is not a request for a reasonable accommodation.

### ii.    Late Arrival

Perdue sent a request by email to her supervisor that she be allowed to arrive at work after 8:00 a.m., because the medication she was taking for bipolar disorder[5] made her drowsy in the morning.  She also stated in the email that if she went to bed between 8:00 and 10:00 p.m. on a regular basis "there are no problems.  However, that is not often feasible due to household responsibilities." Def.'s Exh. B4 (Doc. 54-3) at 99.  Perdue's request was not related to her disability.  Perdue has made no showing that her disability required any accommodation to enable her to arrive at work at the scheduled time. Moreover, and just as important, Defendant did allow Perdue to change her scheduled arrival time at work to 8:30am and she never requested a later arrival time.  Thus, Perdue is unable to show that she suffered any discriminatory act.

### iii.    Blackberry

There is no contested issue here.  Perdue apparently requested a Blackberry phone, was given the Blackberry, but it proved to be distracting due to her ADD.  *See* Pl.'s Resp. (Doc. 56) at 36.

### iv.    Parking

In this instance, Perdue asserts that she requested a parking spot closer to her office.  She claims that her back started hurting after a trip to Atlanta and only started feeling better after she started "Rolfing."  Pl. Resp. (Doc. 56) at 37. Perdue asserts that a closer parking space was something "that Defendant would have granted to pregnant women, and had in fact granted to employees with broken legs and other injuries." *Id.*

---

[5] Perdue states that this diagnosis of bipolar disorder was a misdiagnosis.

Perdue's claim here is based on a sore back, is not related to her disabilities, and is not cognizable under the Rehabilitation Act.

Accordingly, the court finds that summary judgment is due to be granted as to Perdue's Rehabilitation Act claims.

### D.     *Whistle blower & Due Process*

In the Recommendation, adopted by the District Judge, *see* Order (Doc. 29), this court held that Plaintiff was not required to file a more definite statement and that her claims were brought pursuant to Title VII of the Civil Rights Act ("Title VII"), the ADA, and the Rehabilitation Act of 1973.  *See* Rec.  (Doc. 27) at 1 & 3.  Perdue filed her Second Amended Complaint to update her address, correct typographical errors, change the term "Defendant" to "Employee" in reference to individual employees of Defendant, "to question the blatant lies in both the Answer and the Amended answer," and to "add[] information."  Pl.'s Mot. to Amend (Doc. 45) at 1-2.  Plaintiff did not assert that she was adding new claims.  Thus, Perdue's Second Amended Complaint was not filed to add new claims, but to clarify her existing claims.   Indeed, in the Second Amended Complaint, Perdue states that the additional material on pages 7-10 was included to "add additional facts in support of the claim." Second Am. Compl. (Doc. 44) at 6.  What appears on pages 7-10 are not sufficient to constitute new claims and do not meet the basic pleading requirements of the Civil Rules of Procedure.  The court only permitted the filing of the Second Amended Complaint because Plaintiff asserted that the new information was filed in support of her existing claims.  Perdue's "whistleblower" and "due process" claims, then, are not actually proper claims before this court as Perdue may

not "raise new claims at the summary judgment stage." *Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1314-15 (11th Cir. 2004). However, because the parties have agreed that the claims before the court include a whistleblower claim and due process claim, the court will briefly address them.

Perdue asserts that she was retaliated against "in 2002, 2005, and in 2006 for being a whistleblower on alleged grant violations." Pl.'s Resp. (Doc. 56) at 39. It appears that Perdue is attempting to bring a claim pursuant to 31 U.S.C. § 3730(h), which allows private persons to bring civil actions for retaliation against whistleblowing for the misuse of government funds. Defendant raises three bases for summary judgment: statute of limitations; Eleventh Amendment Immunity; and that Perdue never blew any whistle. Without deciding the Immunity issue and whether Perdue was a whistleblower, the court finds that Perdue's claim falls outside the statute of limitations. 31 U.S.C 3730(h)(3) states that "[a] civil action under this subsection may not be brought more than 3 years after the date when the retaliation occurred." Perdue's only response to Defendant's assertion that the claim lies outside the statute of limitations, is to reiterate in her Response that the alleged retaliation took place as late as 2006, that the statute of limitations "is not the issue," and that she attempted to contact the United States Attorney's Office in 2011, but was referred to the Alabama Bureau of Investigations. Pl.'s Resp. (Doc. 56) at 39. This action was filed in 2011, well outside the statute of limitations, and is barred.

As Defendant argues, Perdue's due process claim is not specific. It appears she may be attempting to assert a due process claim against Defendant for failing to follow its

24

own internal policies.  Second Am. Compl. (Doc. 44) at 7-9.  This reading appears to be undermined by Perdue's statement in the Response that "Defendant's internal policies related to conducting investigations created no due process right." Pl.'s Resp. (Doc. 56) at 39.  In addition to agreeing with Defendant the she had no due process right, Perdue fails to address Defendant's argument that she failed to use adequate state remedies.  The court will not engage in conjuring claims *and* responses on Perdue's behalf.  "When a party moves for final, not partial, summary judgment, we have stated that 'it [becomes] incumbent upon the [nonmovant] to respond by, at the very least, raising in their opposition papers any and all arguments or defenses they felt precluded judgment in [the moving party's] favor.'"  *Case v. Eslinger*, 555 F.3d 1317, 1329 (11th Cir. 2009) (quoting *Johnson v. Bd. of Regents*, 263 F.3d 1234, 1264 (11th Cir. 2001)).  Defendant's arguments are well taken and Perdue fails to raise any genuine issues of material fact as to these claims.  Accordingly, Defendant is entitled to summary judgment as to Perdue's whistleblower and due process claims.

## V.   CONCLUSION

For the reasons stated above, it is the RECOMMENDATION of the Magistrate Judge that Defendant's Motion for Summary Judgment (Doc. 53) be GRANTED.

It is further

ORDERED that the parties are DIRECTED to file any objections to the Recommendation **on or before August 20, 2013**.  Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which a party objects. Frivolous, conclusive or general objections will not be considered by the District Court.

The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and advisements in the Magistrate Judge's Recommendation shall bar the party from a *de novo* determination by the District Court of issues covered in the Recommendation and shall bar the party from attacking on appeal factual findings in the Recommendation accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982). *See Stein v. Reynolds Sec., Inc.*, 667 F.2d 33 (11th Cir. 1982); *see also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

Done this 6th day of August, 2013.

/s/ Wallace Capel, Jr.
WALLACE CAPEL, JR.
UNITED STATES MAGISTRATE JUDGE